UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

|  |  |
|---|---|
| CITY OF WARREN POLICE AND FIRE RETIREMENT SYSTEM, on Behalf of Itself and All Others Similarly Situated, | Civil Action No. 1:26-cv-5951 |
| Plaintiff, | CLASS ACTION |
| vs. | COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS |
| GPGI, INC., DAVID M. COTE, THOMAS R. KNOTT, JONATHAN C. WILK, and RESOLUTE HOLDINGS MANAGEMENT, INC., | |
| Defendants. | DEMAND FOR JURY TRIAL |

Plaintiff City of Warren Police and Fire Retirement System ("plaintiff"), on behalf of itself and all others similarly situated, by plaintiff's undersigned attorneys, for plaintiff's complaint against defendants, alleges the following based upon personal knowledge as to plaintiff and plaintiff's own acts and upon information and belief as to all other matters based on the investigation conducted by and through plaintiff's attorneys, which included, among other things, a review of U.S. Securities and Exchange Commission ("SEC") filings by GPGI, Inc. ("GPGI" or "CompoSecure" or the "Company"),[1] Company releases and presentations, transcripts of Company conference calls, and media and analyst reports about the Company and its business. Plaintiff believes that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1. This is a securities class action on behalf of all purchasers of GPGI Class A common stock between November 3, 2025 and May 6, 2026, inclusive (the "Class Period"), against GPGI and certain of its officers, directors, and control persons for violations of the Securities Exchange Act of 1934 ("1934 Act") and SEC Rule 10b-5 promulgated thereunder.

## JURISDICTION AND VENUE

2. Jurisdiction is conferred by §27 of the 1934 Act, 15 U.S.C. §78aa. The claims asserted herein arise under §§10(b) and 20(a) of the 1934 Act, 15 U.S.C. §§78j(b) and 78t(a), and SEC Rule 10b-5, 17 C.F.R. §240.10b-5.

3. Venue is proper in this District pursuant to §27 of the 1934 Act. Many of the false and misleading statements were made in or issued from this District. The external manager of

---

[1] Prior to its January 2026 rebranding as GPGI, the Company was known as CompoSecure, Inc. ("CompoSecure"). The Company is referred to herein as both GPGI and CompoSecure.

GPGI that is the subject of this litigation, defendant Resolute Holdings Management, Inc., maintains its headquarters in this District, defendant Thomas Knott resides in this District, GPGI stock trades in this District on the New York Stock Exchange ("NYSE"), and many of the acts and transactions giving rise to the violations of law complained of occurred here.

4.     In connection with the acts alleged in this complaint, defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications, and the facilities of the national securities markets.

## FRAUDULENT SCHEME AND COURSE OF BUSINESS

5.     As explained further herein, this action involves a multi-step scheme by defendants David Cote, Thomas Knott, and others to gain control of GPGI (then known as CompoSecure), which at the time was a stable company with relatively modest debt, and turn it into a highly leveraged conglomerate from which Cote, his family, and Knott could profit by extracting exorbitant management fees at the expense of GPGI shareholders.

6.     Defendants are liable for: (i) making false statements; or (ii) failing to disclose adverse facts known to them about GPGI.  Defendants' fraudulent scheme and course of business that operated as a fraud or deceit on purchasers of GPGI Class A common stock was a success, as it: (i) deceived the investing public regarding GPGI's prospects and business; (ii) artificially inflated the prices of GPGI Class A common stock; and (iii) caused plaintiff and other members of the Class (defined herein) to purchase GPGI Class A common stock at inflated prices.

## THE PARTIES

7.     Plaintiff City of Warren Police and Fire Retirement System, as set forth in the accompanying certification, which is incorporated by reference herein, purchased GPGI Class A common stock during the Class Period and has been damaged thereby.

8.      Defendant GPGI, Inc. has historically operated a financial technology and security business.  Prior to the Company's January 2026 rebranding, GPGI Class A common stock traded under the ticker symbol "CMPO."  After the rebranding, GPGI Class A common stock traded under the ticker symbol "GPGI."  Although the Company was incorporated in Delaware during the Class Period, GPGI recently re-incorporated in Nevada, a move that has spawned shareholder litigation as discussed in more detail below.

9.      Defendant David M. Cote ("Cote") has served as the Executive Chairman of the GPGI Board of Directors (the "Board") since September 17, 2024.  Cote also served as the Company's Co-Chief Investment Officer from September 25, 2024 until the transfer of his employment to Resolute Holdings Management, Inc. ("Resolute Holdings") in connection with Resolute Holding's February 2025 spin-off from CompoSecure (the "Spin-Off").  At the time, Cote was also appointed Executive Chairman of Resolute Holdings' Board of Directors.

10.      Defendant Thomas R. Knott ("Knott") has served as a member of GPGI's Board since September 17, 2024 and was employed as Co-Chief Investment Officer of GPGI from September 25, 2024 until the transfer of his employment to Resolute Holdings in connection with the Spin-Off.  Afterwards, Knott became sole Chief Investment Officer of the Company and, since January 2026, its Principal Executive Officer.  In February 2025, Knott was appointed Resolute Holdings' Chief Executive Officer ("CEO") and a member of its Board of Directors in connection with the Spin-Off.

11.      Defendant Jonathan C. Wilk ("Wilk") served as the Company's CEO and as a member of its Board during the Class Period until January 21, 2026.

12.      Defendants Cote, Knott, and Wilk (the "Individual Defendants"), because of their positions with the Company and/or Resolute Holdings, possessed the power and authority to

- 3 -

control the contents of GPGI's quarterly reports, releases, and presentations to securities analysts, money and portfolio managers, and institutional investors, *i.e.*, the market.  They were provided with copies of the Company's reports and releases alleged herein to be false and misleading prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected.  Because of their positions with the Company and/or Resolute Holdings, and their access to material, non-public information available to them but not to the public, the Individual Defendants knew that the adverse facts specified herein had not been disclosed to and were being concealed from the public and that the positive representations being made were then materially false and misleading.

13.    Defendant Resolute Holdings Management, Inc. is an alternative asset management and investment firm based in New York City.  Resolute Holdings manages GPGI's day-to-day operations and corporate strategy and is controlled by defendants Cote and Knott.  Resolute Holdings stock is publicly traded under the ticker symbol "RHLD."

## SUBSTANTIVE ALLEGATIONS

**Overview of GPGI**

14.    Originally known as CompoSecure, L.L.C., GPGI was founded in 2000.  Over the next 25 years, GPGI became a leading designer and manufacturer of premium metal payment cards and secure authentication solutions.  By 2025, the Company's market share in the global metal payment card market was approximately 75%, with GPGI delivering more than 32 million payment cards that year while serving over 150 customers across more than 200 branded and co-branded card programs.  Beyond physical cards, the Company expanded into the digital asset space through its Arculus platform, which offers cold storage hardware and a companion mobile app for secure cryptocurrency and digital asset management.  The Company maintained customer

relationships with leading bank issuers like American Express, JPMorgan Chase, and Capital One and leading financial technology companies such as Coinbase, Robinhood, and Gemini.

15. CompoSecure went public in December 2021 through a merger with Roman DBDR Tech Acquisition Corp., a publicly traded special purpose acquisition company, and its shares began trading on The Nasdaq Global Market ("Nasdaq") under the ticker symbol "CMPO."  In September 2025, the Company moved its listing to the NYSE where it retained its ticker.

**Defendants Transform CompoSecure from a Stable
Business to a Self-Serving a Fee Extraction Vehicle**

16. Defendant Cote is an American businessman known for his roles at some of the world's leading multinational conglomerates, including General Electric and TRW Inc.  Cote is best known for serving as the CEO and Chairman of Honeywell International Inc. from 2002 until 2017, during which time Honeywell bought and sold over 100 companies.

17. While at Honeywell, Cote attributed much of the company's success to the "Honeywell Operating System," a management and operations system purportedly designed to continuously improve a company's performance.  This system has been described by others as "a customized version of the celebrated Toyota operating system" that was designed after dozens of Honeywell staff spent two weeks at a Toyota plant in Georgetown, Kentucky.

18. More recently, Cote participated in the "SPAC boom" whereby special purpose acquisition companies ("SPACs"), otherwise known as "blank-check" shell companies, raised capital to acquire private businesses that were then taken public through a reverse merger.  The SPAC listing process ostensibly allowed private issuers to go public without the difficulty, expense, and underwriting of a traditional initial public offering – and without many of the usual safeguards.  Despite their initial promise, SPACs saddled many retail investors with substantial losses.  SPACs have been criticized for flawed financial incentive structures that could benefit

sponsors while damaging outside investors, since sponsors were strongly motivated to complete any merger (even ones that were bad for shareholders) rather than lose their initial investment.[2]

19.    Cote partnered with Goldman Sachs to co-sponsor two SPACs – GS Acquisition Holdings Corp. and GS Acquisition Holdings Corp. II – that later combined with Vertiv Holdings Co. and Mirion Technologies, Inc., respectively.  As head of the Permanent Capital Strategies Group at Goldman Sachs from 2018 to 2023, defendant Knott led Goldman Sachs' co-sponsorship of these SPACs and worked extensively with Cote.

20.    After the SPAC boom went bust, Cote turned to CompoSecure, intending to turn the Company into another Honeywell-like conglomerate.  On August 7, 2024, Cote and CompoSecure announced that Resolute Holdings I, LP and its affiliated vehicles (collectively, "Resolute"), an investment firm under the leadership of Cote and Knott, were acquiring a majority interest in CompoSecure with a $372 million personal investment by "The David Cote Family" (the "Cote Family").  Pursuant to various agreements, the Company's dual-class share structure would be eliminated, Resolute would acquire a majority 60% interest in the Company, defendant Cote would become Executive Chairman of CompoSecure's Board of Directors, and defendant Knott would join the Company's Board.

21.    An August 7, 2024 press release explaining the transaction stated in pertinent part:

> Resolute Holdings I, LP and its affiliated vehicles ("Resolute"), an investment firm under the leadership of David Cote and Tom Knott, and CompoSecure, Inc. (Nasdaq: CMPO) ("CompoSecure" or the "Company"), a leader in metal payment cards, security, and authentication solutions, today announced that certain shareholders of CompoSecure have entered into Stock Purchase Agreements (collectively, the "SPA") with Resolute, pursuant to which Resolute will acquire a majority interest in CompoSecure and eliminate its dual-class structure.

---

[2]    *See, e.g.*, Michael Klausner, Michael Ohrlorgge, & Emily Ruan, *A Sober Look at SPACs*, Yale Journal on Regulation, Vol. 39:228 (2022).

The David Cote Family is investing $372 million through Resolute and Dave Cote will become the executive chairman of the board of directors of CompoSecure upon closing of the transaction. *Resolute will become the majority shareholder of the Company and will focus on deploying operational and M&A best practices to drive long-term value creation for all shareholders*. Importantly, the transaction will remove the dual-share structure, delivering higher retained annual cash flow and better alignment of all shareholders with the elimination of the tax distributions related to the Class B units.

David Cote said, "CompoSecure meets all the criteria I look for when making an investment and I am thrilled that Resolute will become the Company's majority shareholder. CompoSecure has a high-quality management team led by CEO Jon Wilk, a leading market position in its industry, attractive long-term growth prospects, technological differentiation, and robust free cash flow generation. *Tom and I see significant opportunity to continue growing CompoSecure while also diversifying the business and customer base through incremental M&A. In our view, it is the perfect first investment for Resolute and we are excited to get started creating additional shareholder value*."[3]

As further explained in the release, "Mr. Cote and Mr. Knott formed Resolute . . . to invest in businesses that can benefit from the systematic deployment of the operating system Mr. Cote has developed over his career."

22.    The transaction closed on September 17, 2024, with defendants Cote and Knott being appointed to the Company's Board. In addition, the Board increased from seven to eleven directors with one of the newly appointed directors being John Cote, defendant David Cote's son. Effective September 25, 2024, Cote and Knott became CompoSecure's Co-Chief Investment Officers.

23.    After gaining control of CompoSecure, Cote and Knott effectuated the next phase of their scheme. On December 30, 2024, CompoSecure announced its plan to spin off a newly formed subsidiary, Resolute Holdings, as a separate publicly traded company.[4] As part of the

---

[3]    Unless otherwise noted, all emphasis is added here and throughout and footnotes omitted.

[4]    Resolute Holdings is a distinct entity from the Resolute entities that acquired CompoSecure shares in September 2024.

Spin-Off, a wholly owned subsidiary of CompoSecure, CompoSecure Holdings, L.L.C. ("CompoSecure Holdings"), entered into a management agreement with Resolute Holdings (the "Management Agreement") pursuant to which CompoSecure Holdings agreed to pay Resolute Holdings a quarterly management fee equal to 2.5% of CompoSecure's Latest Twelve Months' Adjusted EBITDA (*i.e.*, approximately 10% of CompoSecure's annual Adjusted EBITDA paid out on a quarterly basis).[5]  For perspective, CompoSecure's Adjusted EBITDA for 2024 was approximately $151 million.  Defendant Cote was to become Executive Chairman of Resolute Holdings, defendant Knott its CEO and a member of its Board of Directors, and defendant Cote's son John Cote another director.  The investment team at CompoSecure were to move to Resolute Holdings upon completion of the Spin-Off.  Resolute Holdings would then be responsible for "providing CompoSecure's business with certain services, including providing oversight of its capital allocation strategy, operational practices, as well as M&A sourcing and execution."

24.     On February 10, 2025, CompoSecure announced that its Board had approved the Spin-Off.  The record date for shareholders of CompoSecure to receive shares of Resolute Holdings was set as February 20, 2025, and the distribution was expected to occur prior to the opening of trading on February 28, 2025.  All CompoSecure shareholders as of the record date were to receive one share of Resolute Holdings for every twelve shares of CompoSecure (with fractional shares to be settled in cash).

25.     On March 3, 2025, the Company filed with the SEC a Form 8-K announcing that the Spin-Off had been completed on February 28, 2025.  Shares of Resolute Holdings began trading on the Nasdaq, initially on February 20, 2025 in a "when-issued" market under the ticker

---

[5]     For purposes of the management fee, Adjusted EBITDA, as defined in the Management Agreement, represents "CompoSecure's historical Adjusted EBITDA methodology, less stock-based compensation expense."

"RHLDV" and subsequently in "regular-way" trading on February 28, 2025 under the ticker symbol "RHLD" after the Spin-Off was completed.[6]

26.     Many of the CompoSecure directors who approved the Spin-Off became directors of Resolute Holdings after the Spin-Off closed, with Cote becoming Resolute Holdings' Executive Chairman and Knott becoming a director and its CEO.   The Management Agreement also effectively gave Resolute Holdings dominion over the Company's day-to-day operations and management team as well as CompoSecure's corporate and M&A strategy, including the rights and obligations to do the following:

- establish and monitor the Company's objectives, financing activities, and operating performance;

- select and oversee the Company's management team and their performance;

- devise capital allocation strategies, plans, and policies of the Company;

- set the budget parameters and expense guidelines of the Company and monitor compliance therewith;

- identify, analyze, and oversee the consummation of business opportunities and potential acquisitions, dispositions, and other business combinations;

- originate and recommend opportunities to form or acquire, and structure and manage, any joint ventures;

- lead or oversee negotiations with potential participants in any business opportunity under the Company's consideration and determine (or delegate to any officer of the Company the decision to determine) if and when to proceed;

---

[6]     Like CompoSecure, Resolute Holdings transferred the listing of its common stock from the Nasdaq to the NYSE in September 2025, retaining its "RHLD" ticker.

- engage and supervise, on the Company's behalf, independent contractors and third-party service providers;

- communicate on behalf of the Company with the holders of any securities of the Company (A) as required to satisfy any reporting and other requirements of any Governmental Authority having jurisdiction over the Company and (B) to maintain effective relations with such holders;

- oversee all claims, disputes, or controversies (including all litigation, arbitration, settlement, or other proceedings or negotiations) in which the Company may be involved or to which the Company may be subject arising out of the Company's day-to-day activities (other than with the Manager or its Affiliates);

- counsel the Company in connection with decisions required by Delaware law to be made by the Board; and

- perform such other services from time to time in connection with the management of the business and affairs of the Company and its activities as the Company shall reasonably request and/or the Manager shall deem appropriate under the particular circumstances.

27. In its first quarterly report after the Spin-Off ("Resolute Holdings 1Q25 Form 10-Q"), Resolute Holdings acknowledged that, under the relevant accounting rules, Resolute Holdings was required to account for CompoSecure Holdings as a consolidated variable interest entity because the terms of the Management Agreement made Resolute Holdings the "primary beneficiary" of CompoSecure Holdings:

> In connection with the completion of the Spin-Off, Resolute Holdings entered into a management agreement with CompoSecure Holdings (the "CompoSecure Management Agreement"), pursuant to which Resolute Holdings is responsible for managing the day-to-day business and operations and overseeing

the strategy of CompoSecure Holdings and its controlled affiliates.  In accordance with ASC 810 and due to the terms of the CompoSecure Management Agreement, Resolute Holdings (together with CompoSecure Holdings, the "Company") is required to consolidate CompoSecure Holdings because it is a variable interest entity ("VIE") in which Resolute Holdings is deemed to be the primary beneficiary . . . .  Resolute Holdings does not own any equity interests or common stock in CompoSecure Holdings or CompoSecure.

28.    Correspondingly, CompoSecure reported in its Form 10-Q filed with the SEC on May 12, 2025 ("CompoSecure 1Q25 Form 10-Q") that the Company was changing to the equity method of accounting to report its interest in CompoSecure Holdings and its operating company subsidiaries due to Resolute Holdings' newly gained control over them:

The Company has a variable interest in Holdings, the Company's wholly owned operating subsidiary.  Holdings is considered a VIE as the Company is the sole holder of the Holdings' equity investment risk but is not able to direct the activities that most significantly impact Holdings' economic performance. Effective as of February 28, 2025, the date of the Spin-Off of Resolute Holdings, and resulting from Holdings entering into the Management Agreement with Resolute Holdings, the Company determined that Holdings is a VIE for which the Company is not the primary beneficiary, as the Company does not have the power to direct the activities of Holdings that most significantly impact its economic performance.  Therefore, the results of operations and cash flows of the Company's wholly-owned subsidiary, Holdings, and the operating companies which are its subsidiaries, are not consolidated in the financial statements included in this report and, instead, are accounted for under the equity method of accounting.  Under the equity method of accounting, the financial information of Holdings is not reflected within the Company's consolidated balance sheets, statements of operations and cash flows.  The Company's share of the earnings of Holdings is reported in a single line item within the Company's consolidated statements of operations and cash flows as earnings from equity method investment.  The carrying value of the Company's investment in Holdings is reported in the Company's consolidated balance sheets as equity method investment.  This equity method investment is increased (decreased) by the Company's share of the earnings (losses) of Holdings and is also decreased by the Company's share of dividends declared by Holdings from time to time (if any).  The Company's investment in Holdings is accounted for using the equity method of accounting because the Company has the ability to exercise significant influence over Holdings, but as a result of the Management Agreement, does not have control over Holdings.  No gain or loss is recognized upon conversion of Holdings as an equity method investment because Resolute Holdings and the Company are both under common control.

- 11 -

29.    Furthermore, the Management Agreement contained provisions that gave Cote and Knott control of CompoSecure for an open-ended duration.  For all practical purposes, the Management Agreement was non-terminable.  The Management Agreement had an initial ten-year term that automatically renewed for additional ten-year terms in perpetuity.  The Company could only terminate the agreement without payment of a large termination fee (calculated pursuant to a complex formula that was a function of potential fees) under very limited circumstances such as bankruptcy or a final judgment by a governmental authority of a felony or material violation of applicable securities laws that had a material adverse effect on the Company's business or the ability of Resolute Holdings to perform its duties.

30.    This level of control was critical to defendants' fraudulent scheme, as it allowed Cote and Knott to retain operational control of CompoSecure even if Resolute's ownership interest in CompoSecure was later diluted by CompoSecure acquisitions paid for with CompoSecure stock.

31.    Furthermore, §5 of the Management Agreement permitted Resolute Holdings to enter into similar management agreements with entities subsequently acquired by CompoSecure. Thus, any acquisition by CompoSecure could be used to significantly increase the management fees paid to Resolute Holdings, providing strong incentives for CompoSecure's management to acquire new businesses even if such acquisitions were overvalued or against the interests of CompoSecure and the Company's outside shareholders.  Furthermore, by calculating management fees based on Adjusted EBITDA, a non-Generally Accepted Accounting Principles ("GAAP") earnings metric that excludes the costs of interest on debt and other actual expenses, Resolute Holdings was incentivized to fund CompoSecure's acquisition activities with Company debt.  This conflict became more acute over time as Resolute's ownership interest in CompoSecure became diluted by CompoSecure stock issuances.

**CompoSecure Buys Husky to Generate
Fees for Resolute Holdings**

32.      On November 3, 2025, CompoSecure announced its first acquisition after the Spin-Off, Husky Technologies Limited ("Husky"), a manufacturer and provider of plastic injection molding equipment, systems, and services used to manufacture plastics products, such as water bottles and medical devices (the "Husky Acquisition").   CompoSecure and certain of its subsidiaries entered into a share purchase agreement with Husky, Platinum Equity Advisors, LLC ("Platinum Equity"), certain entities affiliated with Platinum Equity, and certain members of Husky management.

33.      To buy Husky, CompoSecure agreed to pay aggregate consideration of approximately $5 billion subject to post-closing adjustments, consisting of nearly $4 billion in cash and more than 55 million CompoSecure shares.  The Husky Acquisition was to be financed by a private placement offering ("PIPE") of $2 billion of discounted CompoSecure common stock (approximately 106 million shares at $18.50 per share)[7] and cash, including from approximately $2 billion in new debt commitment letters that the Company had secured.[8]  The combined business was valued at approximately $7.4 billion, with Husky representing approximately $5 billion of the total value.

34.      After closing, Husky was to become an indirect wholly owned subsidiary of CompoSecure, with Husky being run as a standalone business that would continue operating under

---

[7]      CompoSecure's stock price closed at $19.86 per share on October 31, 2025, the last trading day prior to the Company's announcement of the Husky Acquisition.

[8]      For reference, as of December 31, 2025, the Company had cash and cash equivalents of $114.6 million, $41.1 million in U.S. treasury bills, and total debt principal outstanding of $186.3 million.

its current management team.[9]  In addition, Husky was to enter a management agreement with Resolute Holdings on substantially the same terms, including fee provisions, as the Management Agreement (the "Husky Management Agreement" and collectively with the Management Agreement, the "Management Agreements").

35.    Tellingly, on the day that the Husky Acquisition was announced, the price of Resolute Holdings stock closed up *97%* ($71.31) per share, while the price of CompoSecure stock only increased $0.68 per share.

36.    As detailed below, defendants touted the purported value, operational and financial strength, and growth prospects of Husky to secure shareholder support of the Husky Acquisition. These solicitation efforts were successful, and on December 24, 2025, CompoSecure announced that its stockholders had approved the deal.

37.    On January 12, 2026, CompoSecure announced the completion of the Husky Acquisition and that the Company would be rebranding as "GPGI, Inc."  GPGI stood for "Great Positions in Good Industries," a nod to the purported strength and quality of the Husky Acquisition and the deal acumen of Resolute Holdings.

38.    Following the Acquisition, GPGI had two reporting segments: (i) CompoSecure; and (ii) Husky.  In addition, Resolute's ownership stake in CompoSecure (now named GPGI) was reduced to approximately 17% of total Company shares outstanding as a result of the dilution caused by the issuance of new shares to fund the transaction.

39.    As alleged below, defendants made materially false and misleading statements to investors overvaluing Husky and misrepresenting the purported benefits of the Husky Acquisition

---

[9]    References herein to Husky after the close of the Husky Acquisition refer to the post-close entity and subsidiary created within CompoSecure to house the Husky assets and operations.

- 14 -

in order to secure shareholder approval of the deal, secure PIPE funding, generate millions of dollars' worth of additional management fees, and advance defendants' fraudulent scheme to transform CompoSecure into a wealth transfer vehicle for Cote, the Cote Family, and Knott.  As a result, GPGI's stock price reached a Class Period high of nearly $27 per share on the first day of the Class Period only to fall to less than $13 per share in the days following the Class Period's end, a decline of more than 50%.  The precipitous decline in the price of GPGI stock as a result of the fraudulent scheme and course of business detailed herein has inflicted substantial economic harm and financial losses on plaintiff and other members of the Class.

**DEFENDANTS' MATERIALLY FALSE AND MISLEADING
STATEMENTS AND OMISSIONS ISSUED DURING THE CLASS PERIOD**

40.    The Class Period begins on November 3, 2025.  On that date, CompoSecure issued a press release announcing its third quarter 2025 ("3Q25") financial results and that CompoSecure had entered into an agreement to acquire Husky in a transaction valuing the combined business at approximately $7.4 billion, stating in relevant part as follows:

> CompoSecure, Inc. (NYSE: CMPO), a leader in metal payment cards, security, and authentication solutions, today announced its financial and operating results for the third quarter ended September 30, 2025.  ***Concurrently, CompoSecure announced a business combination with Husky Technologies Limited ("Husky"), a market leading manufacturer of engineered equipment and aftermarket services, in a transaction that will value the combined business at approximately $7.4 billion***.

41.    Defendant Cote was quoted in the release as highlighting the purported strengths of Husky's business and the value of the proposed transaction, stating in relevant part as follows:

> "In addition to the strong quarter at CompoSecure, we are delighted to announce the business combination with Husky.  ***This is a business Tom and I have long admired, and it hits all the key criteria we look for in every investment – it holds a great position in a good industry, significant technology differentiation, organic and inorganic growth possibilities, and margin expansion potential.  We*** are excited to begin working with the Husky team and ***believe the combined business is uniquely well positioned to deliver for investors***."

42.    The release further stated that CompoSecure had valued Husky at roughly double CompoSecure's existing business (*i.e.*, $5 billion versus $2.4 billion) and that the acquisition would be quickly and materially accretive to earnings, stating as follows:

> ***Under the terms of the transaction, CompoSecure will combine with Husky for an enterprise value of approximately $5 billion, representing approximately 11.2x 2026E Pro Forma Adjusted EBITDA of $445 million[, net of management fees to Resolute Holdings].  The combined entity will have a pro forma enterprise value of approximately $7.4 billion, representing approximately 11.6x 2026E Pro Forma Net Adjusted EBITDA of approximately $635 million[, net of management fees to Resolute Holdings]***.

*    *    *

> ***The transaction is expected to be 20%+ accretive to adjusted diluted earnings per share in the first full year post-closing***.

43.    On November 3, 2025, CompoSecure held a call to discuss its 3Q25 results and the Husky Acquisition.  On the call, defendant Cote highlighted the purported strengths of Husky's business and explained how the Husky Acquisition was part of the Company's purported "value creation plan," stating:

> Well, what a wicked great day we have to celebrate today.  We have good news busting out all over.  So before I get into CompoSecure's third quarter, I want to begin with a few remarks about my excitement regarding the Husky transaction. When my family invested in CompoSecure over a year ago, ***a big part of the value-creation plan was to implement our operating system to catalyze organic growth, improve margins, and build a rigorous discipline around capital allocation to pursue accretive inorganic growth***.  While still early, we're delivering strong organic growth and improved profitability at CompoSecure.
>
> The third-quarter results are terrific.  ***Over the past year, we have been actively looking for another great business that could benefit from our operating system and shares the same foundational characteristics we look for at Honeywell, Vertiv, and CompoSecure.  I am delighted to report that we have found all that and more in Husky.  We view the combination of CompoSecure and Husky as the foundation for a best-in-class diversified compounder***.
>
> CompoSecure is the global leader in manufacturing premium metal payment cards and authentication solutions.  ***Husky is the global leader in highly engineered injection molding equipment and aftermarket services.  Collectively, they form a platform positioned to become the home for market-leading***

- 16 -

*businesses that operate in attractive industries, generate recurring revenues, deliver high growth and profitability, achieve attractive returns on incremental invested capital, and offer significant opportunities for long-term value creation.*

*Husky checks every box of our investment criteria. It has a great position in a good industry. It differentiates with technology, and it presents a substantial upside potential in both organic and inorganic growth, along with clear opportunities for margin expansion. Coupled with an ability to generate strong free cash flow and a healthy pro forma balance sheet that will delever quickly, we find this to be an incredibly compelling opportunity for CompoSecure investors as we expand the operating platform.*

44.    Later in the call, defendant Cote highlighted how ostensibly well positioned Husky

was to deliver growth and profitability for investors, stating as follows:

Switching to slide 3 of the business combination presentation. *The combination with Husky creates a best-in-class diversified compounder. The combined platform brings together two global market leaders, each operating in fundamentally good industries with best-in-class financial profiles, approximately 70% recurring revenue, and significant long-term growth potential. Importantly, this transaction is highly accretive to CompoSecure's investors, supports long-term value creation and preserves balance sheet flexibility for future M&A.*

Starting with the market, Husky operates in a fundamentally good industry that has been historically underappreciated. The industry has supported solid growth and attractive margins for years, and *we believe the fundamentals are firmly in place for that to continue for a long time to come, especially with the growing awareness of PET's superior carbon footprint, the regulatory push for plastic circularity, and the growing adoption of recycled plastics in packaging.*

Growth in PET beverage demand, primarily bottled water, is the underlying secular trend driving the market for Husky's equipment, and it's hard to imagine a future without a lot more packaged beverage bottles as the world continues to urbanize. *Overall, Husky is well positioned to capitalize on favorable long-term demand drivers across its key end markets.*

Turning to the company. Husky is a globally recognized brand with a long-standing reputation for manufacturing best-in-class systems. *Platinum and the management team have established a great foundation, and their efforts have yielded solid organic growth in the last five years with identifying opportunities to accelerate growth in 2026 and beyond.*

In many ways, Husky today is where both Honeywell and Vertiv were at the onset of my involvement. *Husky is well positioned to benefit from the same*

- 17 -

*operating system and process discipline that drove consistent outperformance at Honeywell, Vertiv, and now, CompoSecure*.

45.     Defendant Knott also spoke on the call, highlighting the purported strength of Husky's business and its expected growth and profitability, stating in pertinent part as follows:

Thank you, Dave.  Let me begin by reiterating how excited we are about the opportunity for CompoSecure to combine with Husky.  The transaction establishes us as a highly differentiated and diversified compounder and the opportunities ahead are many.  Stepping back, we began this journey in September 2024 with the acquisition of a majority interest in CompoSecure.

Since that time, the company's performance has accelerated materially, and we are beginning to see early gains from the systematic deployment of our operating system throughout the company.  We have a proven approach to business operations, and *we are confident that Husky exhibits all the same foundational qualities that will enable durable long-term value creation for our investors as we begin working with Brad and his team*.

Turning to slide 4.  *We are acquiring Husky for approximately $5 billion or 11.2 times 2026 net adjusted EBITDA, applying an enterprise value of $7.4 billion or 11.6 times 2026 net adjusted EBITDA on a combined basis.  The transaction is expected to be accretive to diluted EPS in the first full year post combination* and will be funded through a $2 billion private placement, approximately $1 billion in rolled equity from Platinum and approximately $2 billion of debt, resulting in 3.5 times net LTM leverage.  We expect the transaction to close in the first quarter of 2026, subject to customary regulatory approvals and closing conditions.

Turning to slide 5.  *Husky checks every box of our investment criteria just as CompoSecure did*.  It is the number one player in both PET system sales as well as aftermarket.  The company operates in a large, structurally growing industry characterized by acyclical customer demand.  It has a long history of engineering-led innovation that drives strong technology differentiation.

We are also excited about growth opportunities we see for the business, supported by 65% recurring revenue from aftermarket sales and a highly fragmented competitive landscape.  Lastly, we have already started working with the Husky team on implementing our operating system to drive growth, further margin expansion, and continued strong free cash flow.

46.     Defendant Knott continued by claiming that the Husky Acquisition "will be highly accretive to earnings," stating:

Turning to slide 6. ***The transaction provides significant structural and financial benefits to CompoSecure. It diversifies our revenue base and end market exposure, reduces customer concentration, increases scale, will be highly accretive to earnings, improves capital allocation flexibility, and offers substantial runway for further investor value creation***.

Turning to slide 7. Husky is the global leader in integrated engineered equipment and aftermarket services. Its business model operates much like a razor-razor blade model with an installed base of approximately 13,500 systems that result in approximately 65% recurring revenues from aftermarket parts, tooling, and services. Importantly, while Husky's equipment and services typically represent less than 5% of customers' annual operating costs, they are critical for the customers' operations with immense focus on productivity, uptime, and reliability. This focus on high criticality, high-value products aligns closely with how we think about CompoSecure's market leadership in metal cards.

Turning to slides 8 and 9. These pages really summarize the pro forma platform. ***The combined businesses deliver immediate scale and are positioned to deliver mid- to high-single-digit organic growth, approximately 70% recurring revenue, approximately 12.5% EBITDA growth annually, 100 basis points of margin expansion opportunity per year, and approximately 7.5% free cash flow yield in year one. Taken together, the company has a best-in-class financial profile, durable growth drivers, all being offered at a significant discount to peers***.

In summary, we are extremely excited about this transformative transaction and to partner with Husky. ***The transaction brings together two market leaders to create a best-in-class diversified compounder***. While I'm excited about the momentum we've already seen at CompoSecure as we deliver above-market, top and bottom-line growth, I am even more excited about the opportunities I see ahead for the combined platform.

47.    In order to consummate the Husky Acquisition, CompoSecure needed shareholder approval for the issuance of over 161 million new shares, which included approximately 106 million to be sold to PIPE investors and 55 million to be paid as deal consideration. On November 24, 2025, CompoSecure filed with the SEC a proxy statement that solicited shareholder approval for the deal by highlighting the purported strengths of Husky and the acquisition's benefits to CompoSecure shareholders (the "Proxy Statement"). Defendants Cote and Wilk signed the cover letter included in the Proxy Statement, and the notice of the special meeting was signed by defendant Cote at the direction of the Board.

48.     The Proxy Statement valued Husky at approximately $5 billion, stating:

For purposes of the analyses summarized below, the implied value of the Transaction Consideration to be paid by CompoSecure was assumed to be $4.976 billion, consisting of $3.953 billion in cash consideration (assuming for such purposes that the adjustments to the cash consideration provided for in the Transaction Agreement would be equal to zero) and $1.023 billion in stock consideration, based on 55,297,297.3 shares of Common Stock issued multiplied by $18.50 per share.

49.     The Proxy Statement listed a number of purported reasons why CompoSecure's Board approved the transaction and favored the share issuance, including first and foremost the claim that the transaction would be immediately accretive, stating: "***Accretion.   The Board believed that the Transactions will be immediately accretive to key fiscal year 2026 estimated financial metrics, including at least 20% accretive to adjusted diluted earnings per share in the first full year post-closing***."

50.     The Proxy Statement additionally included purported projections for Husky for the years 2025 through 2030.  According to the Proxy Statement, Husky would generate Net Revenue of $1.582 billion in 2025, $1.715 billion in 2026, $1.844 billion in 2027, $1.975 billion in 2028, $2.110 billion in 2029, and $2.250 billion in 2023.  CompoSecure further estimated Husky would generate Adjusted EBITDA[10] of $400 million in 2025, $444 million in 2026, $500 million in 2027, $561 million in 2028, $627 million in 2029, and $696 million in 2030.

---

[10]     CompoSecure defines Adjusted EBITDA as net income before interest and taxes, and is adjusted to add back depreciation and amortization, extraordinary losses and expenses, certain one-time non-recurring fees and expenses (including transaction expenses), non-cash compensation or expense, or non-cash charge that represents any accrual or reserve for anticipated cash charges in any future period, resulting from contingent payment obligations, foreign exchange hedge losses/gains, including unrealized gains/losses, impairment charges or asset write-offs and other non-cash non-recurring expenses, and minus extraordinary gains and cash payments made in respect of non-cash non-recurring expenses.

51.     On January 12, 2026, CompoSecure issued a press release announcing that it had completed the Husky Acquisition following shareholder approval, stating in relevant part:

> CompoSecure, Inc. (NYSE: CMPO) completed its previously announced business combination with Husky Technologies Limited ("Husky"), a leader in highly engineered equipment and aftermarket services.  The combination of Husky and CompoSecure creates a best-in-class, diversified compounder featuring two global market leaders with ~70% recurring revenues, high margins, and strong free cash flow generation.
>
> ***As previously disclosed, the combined business is valued at $7.4 billion [with enterprise value based on the private placement price of $18.50 per share of CompoSecure stock], representing ~11.6x 2026E Pro Forma Adjusted EBITDA [net of management fees to Resolute Holdings] of ~$635 million and a ~7.5% free cash flow yield***[11] ***in the first full year post closing.  Additionally, the transaction is expected to be more than 20% accretive to adjusted diluted earnings per share in the first full year post closing***.

52.     The statements referenced in ¶¶40-46, 49-51 above were materially false and misleading when made because they failed to disclose the following adverse facts pertaining to the Company's business, operations, and financial condition, which were known to or recklessly disregarded by defendants:

(a)     that defendants had materially overstated the value of Husky;

(b)     that Husky was not on track to achieve the revenue and Adjusted EBITDA targets provided in the Proxy Statement and such targets lacked a reasonable basis in objective fact;

(c)     that a primary motivation of the Husky Acquisition was to generate millions of dollars in fees for Resolute Holdings and the Individual Defendants, rather than to create long-term value for CompoSecure shareholders; and

---

[11]     CompoSecure defines non-GAAP free cash flow yield as free cash flow (cash flow from operations less capital expenditures) divided by fully diluted equity value at $18.50 per share.

(d)    that, as a result of (a)-(c) above, defendants had materially misrepresented the business, prospects, and expected financial results of GPGI and Husky as a combined business.

53.    On February 26, 2026, short seller Jehoshaphat Research ("JR") announced a new report that claimed GPGI had overstated the value of Husky in order obtain shareholder approval for the Husky Acquisition.  In a social media post, JR described GPGI as a "wealth transfer platform" designed to enrich the Cote Family at the expense of Company shareholders, stating as follows:

> We are short $GPGI, an industrial conglomerate with easy to borrow stock and $7bn of market cap.  Below is a summary of some of the key opinions in this idea; for the full short thesis including a downloadable PDF, please see the Jehoshaphat Research website.
>
> 1) We believe GPGI is playing a variety of accounting games to inflate the performance of the much larger company it just acquired.  All major aspects of the financials appear to be affected – FCF, revenue, Adjusted EBITDA, etc.  For example, in our opinion the acquired company's "free cash flow" is 90% overstated, while GPGI is conflating different versions of FCF in a way that makes projections appear attainable.
>
> 2) This acquired company (Husky Technologies), at >70% of pro forma company EBITDA, is now the main story for GPGI.
>
> 3) We believe the prior owners who sold Husky to GPGI may have been playing even more aggressive accounting games, which leads us to suspect that GPGI has been – knowingly or unknowingly – inflating an already- inflated balloon.
>
> 4) We believe GPGI is "flawed by design," that it's a wealth transfer platform built to enrich its insiders at the expense of outside shareholders.  But GPGI leadership is clever; at first glance, it looks like insiders and outside investors are unusually well-aligned.  The unusual corporate structure feels smart, and it feels like it's for smart people; that might be why few seem to be willing to point out how egregious certain aspects of it are, lest they appear unsophisticated?
>
> 5) We believe these misaligned incentives have created the need for Management to make outlandish promises about GPGI's financial performance and the performance of the recently acquired company, Husky Technologies.  Incentives remain undefeated for predicting human behavior.

6) A technical overhang creates the conditions for a short to potentially work faster here, while the stock has no valuation support due to a sizeable "conglomerate premium" apparently baked in. (We wonder how the PE firm that sold Husky to GPGI managed to secure a remarkably short lockup on its GPGI shares.)

54.    JR made the full 59-page report (the "JR Report") available on its website. The Executive Summary portion of the JR Report further explained JR's conclusions as follows:

GPGI, or "Great Positions in Good Industries," is an American conglomerate that pays management fees to another public company controlled by the GPGI Chairman's family. If GPGI does an acquisition, these management fees grow, and the bigger the acquisition, the greater the fees. Last month, following a relatively brief due diligence period, GPGI completed a humongous acquisition. Contain your surprise.

To get this humongous acquisition (Husky Technologies) approved by GPGI shareholders, GPGI got creative in its accounting. Dramatically overstating Husky's free cash flow, using different versions of a key metric in different places, extrapolating a rare pocket of abnormal revenue growth into many years of projections, and padding its Adjusted EBITDA with opaque add-backs are some of the gimmicks we believe are being employed. Management is presenting Husky to GPGI shareholders as something it's not and never has been.

All this inflates an already-inflated balloon. Former Husky employees tell us of aggressive methods their company would use even before the GPGI deal, such as shipping Husky's products to its own parking lot to justify revenue recognition, or other means to "pull forward" revenue. If true this is the stuff of scandal, but our immediate concern is deflation to revenues in 2026, Husky's first year as part of GPGI. Both Husky's CEO and its CFO gave notice last week; both cited "personal reasons;" neither had a replacement lined up which suggests the resignations were surprises to GPGI.

All this sits atop a technical iceberg, which is unusually favorable for a short here. A large overhang of likely motivated sellers exists, including Husky's former PE owner who somehow scored a "reduced" lockup on its 55m GPGI shares. And recent PIPE investors, unburdened by any such lockups, can crystallize sudden capital gains at current prices before ever having to take earnings risk. Meanwhile this conglomerate trades at a hefty sum-of-the-parts premium, no doubt due to the "cult-of-personality thesis" around the Chairman that might have substituted for some investors' financial due diligence. A resulting information gap could why nobody seems to have noticed GPGI subtly "reframing" certain projections, even before reporting its first quarter with Husky.

Husky is a pig, a pig that a pair of pig farmers (its CEO and CFO) put lipstick on and sold to a pig broker. The pig broker then gave the pig lip injections.

- 23 -

The pig broker sold part of the pig to a group of pig flippers in a PIPE (Private Investment with Pig Excrement). The pig flippers quickly notched a phenomenal IRR with little risk; they can now flip their pig parts to the public at a premium. After batting around some names for the new arrangement, the pig broker came up with GPIG, but decided that was too promotional; they wanted something more sober, more understated. They landed on "Great Positions in Good Industries, Inc." The pig now pays management fees to the pig broker, based not on the weight of the pig but on the pro forma dimensions of its lips. The pig farmers left town.

55.    The JR Report detailed the "accounting games" allegedly used by GPGI, which were purportedly bolstered by the statements of former Husky employees, as stated in the report's "Table of Key Opinions" replicated in relevant part below:

I.    **ACCOUNTING GAMES**
*GPGI is using misleading financial reporting to make its FCF, Adj. EBITDA and revenue projections for Husky look reasonable. FCF projections are already being walked back, but quietly.*
a.    GPGI is grossly overstating Husky's "free cash flow"
- The first hint that something is wrong with FCF
- We believe Husky's "true" FCF is approximately 90% lower than what GPGI presents it as
- Analyzing Husky's "true" FCF shows projections are ridiculous
- This is not the "7.5% FCF yield" claimed by GPGI
b.    Is Husky's Adjusted EBITDA just whatever GPGI management needs it to be?
- "Recurring non-recurring" EBITDA adjustments worth ~$44mm annually
- The highest Adjusted EBITDA/Gross Profit ratio in the space? (N=50)
- Adjusted EBITDA projections require a hockey stick anyway
c.    Former employees: Husky's numbers may have been inflated even before GPGI bought it
- Former Husky exec on the Adjusted EBITDA claimed in GPGI docs: "That sounds too high, honestly"
- Another former describes Husky shipping product to its own parking lot and recognizing revenue on it
- "If you let us ship it early, we'll delay billing": A third former claims Husky uses a classic revenue inflation trick
- GPGI's diligence process on Husky was awfully brief
d.    Revenue projections are clearly aggressive in full context
- Husky has averaged 0-2% annual growth over time, but Management is projecting 6-8% over time
- Using the 2021-2025 period as a yardstick for Husky's future growth sets unrealistic expectations

56.    The JR Report relayed the purported confessions of a former Husky employee concerning Husky's improper revenue recognition practices:

<u>Former Husky Executive 2</u>: "Everybody was like, okay, just get it on the flatbed truck. We'll just park them, but the revenue was recognized . . . Everybody knew, like, everybody in the organization knew what was going on. **We'd just put [finished products on a truck] in the parking lot, which is not a warehouse, because if it's still sitting in your warehouse, you could argue, well then you haven't really sold it.** But in this case it went out, it sits in the parking lot . . . the pressure was on the revenue to make sure we did that."

(Emphasis in original, including color.)

- 24 -

57.     The JR Report also highlighted the incentives Cote and Knott had to pursue deals that were purportedly value destructive to GPGI shareholders:

II.    **CHAIRMAN'S PROBLEMATIC INCENTIVES**
      *GPGI leadership is incentivized to do a huge deal and overpromise what it can do, even if it destroys the stock. We believe the Husky deal is emblematic of this problem.*
      a.    One simple formula to explain the incentives of GPGI's Chairman
      b.    Even a terrible acquisition drives more payments to the Chairman's investment vehicle
      c.    A bizarre conflict of interest: The more Adjusted EBITDA GPGI reports, the poorer outside investors get
      d.    GPGI appears to have been desperate to get the Husky deal done

58.     According to JR's analysis, "Every $1m of Adjusted EBITDA acquired by GPGI offsets ~2c of decline in GPGI stock price," as stated below:

> **Management's interest in GPGI's stock price is almost certainly subordinate to its interest in RHLD's stock price**. The Chairman's family owns a great deal of RHLD, which trades at a massive multiple of its fee income from GPGI. So when GPGI does a value-destructive acquisition that harms the value of GPGI stock but increases the value of RHLD stock, this can result in a massive net windfall for the Cote Family anyway.
>
> The enormous management fee charged to GPGI by RHLD **means it isn't simply about how much GPGI stock the Cote Family owns,** *it's about how its GPGI ownership compares to its RHLD ownership*.
>
> We pondered this issue a lot before landing on a formula that we think represents where the Chairman's true incentives lie. Using rounded values that we will get more specific with shortly, we call this opinion the "Cote Family Breakeven Rule." It's our calculation of what the Cote Family should be able to lose in GPGI stock value caused by GPGI doing value-destructive acquisitions and still break even from the gain in RHLD caused by those acquisitions:
>
> ***Every $1m of Adjusted EBITDA acquired by GPGI offsets ~2c of decline in GPGI stock price***

(Emphasis in original.)

59.     According to the JR Report, even a large acquisition that added $500 million in incremental Adjusted EBITDA to GPGI could break even or generate a profit for the Cote Family, despite destroying up to $610 million in GPGI shareholder value.

- 25 -

60.     On March 12, 2026, the Company issued a press release announcing GPGI's fourth quarter 2025 ("4Q25") and fiscal year 2025 ("FY25") results and held an earnings call.  Although the Husky Acquisition did not close until the first quarter of 2026 ("1Q26"), GPGI provided information regarding Husky's 4Q25 performance, including in a slideshow filed with the SEC as an exhibit to a Form 8-K filed that day ("4Q25 Earnings Presentation").

61.     The 4Q25 Earnings Presentation disclosed that Husky had $520.8 million in 4Q25 net sales (up 6.1% year-over-year) and $1.5687 billion in FY25 net sales (up 5% year-over-year). The presentation further stated that Husky had Pro Forma Adjusted EBITDA[12] of $136.1 million in 4Q25 (down 5.4% year-over-year) and $373.4 million in FY25 (down 3% year-over-year). Notably, Husky's Pro Forma Adjusted EBITDA margins for 4Q25 compressed by 318 basis points from 29.3% to 26.1%.

62.     On the call, Husky's Chief Financial Officer ("CFO") John Linker attributed Husky's compressed margins to a product mix shift towards lower margin new system sales, increased investments in personnel and product prototyping, and increased overhead for ramping up to deliver future sales, stating:

> Thanks, Rob.  Closing out with slide 33, we cover Husky's financial performance for the fourth quarter and full year 2025, noting that the business combination closed after the quarter end in January 2026.  Net sales increased to $521 million in the fourth quarter, up over 6% from prior year, primarily from volume, and also a small tailwind from FX.
>
> Fourth quarter volume growth came primarily from China, India, Europe, and Latin America, while North America and the Middle East were flat and Africa declined.  Net sales increased to approximately $1.57 billion for full year 2025, up 5% from 2024, again due to volume with the small tailwind from FX.
>
> Full year 2025 volume growth was driven by strength in Europe, Latin America, the Middle East, and India, while China declined due to a tough year over

[12]     Pro Forma Adjusted EBITDA includes the management fee that would have been paid had Husky's management agreement with Resolute Holdings been in effect from January 1, 2024.

year comp.  However, the momentum and sales growth was offset by margin compression in both the fourth quarter and full year 2025.  Margins were adversely impacted by three primary drivers unique to 2025 that we have confidence will not recur going forward.

First, from a product mix standpoint, we delivered higher sales growth and new systems sales versus aftermarket.  This transient mix brought down blended margins in 2025, but it also means that we're seeing an acceleration in new systems demand, which grows the install base and drives margin accretive aftermarket sales in future periods.

Second, we made strategic investments in salesforce coverage, service contract labor, and new product prototyping to support long-term volume growth in future periods.  Lastly and most acutely in the fourth quarter, we faced variable cost and efficiencies and labor and overhead as we ramp the organization to deliver the record level of sales throughput.

With respect to ongoing investments, particularly now as a GPGI company, we are focused on catalyzing sales growth, improving profitability through operational efficiencies and accelerating new product introductions.  All of these initiatives are being enabled by the significantly enhanced capital structure under GPGI and operating focus and expertise from Resolute, paired with the long-standing culture of innovation at Husky that is no longer capital constrained.

63.    In response to the news, the price of GPGI stock fell from a closing price of $19.74 per share on March 11, 2026 to $16.51 per share on March 13, 2026, a decline of $3.23 per share (16%) over two trading days on abnormally high trading volume.

64.    Despite these revelations, the price of GPGI common stock continued to trade at artificially inflated levels because defendants continued to conceal the true facts and to make materially false and misleading statements that artificially inflated the trading price of GPGI Class A common stock, as detailed herein.

65.    For example, in the 4Q25 press release, GPGI provided guidance for its full year 2026 including Pro Forma Adjusted Net Sales of $2.183 billion to $2.228 billion and Pro Forma Adjusted EBITDA of $620 million to $650 million.  Defendant Knott reiterated this guidance on the 4Q25 earnings call, stating: "We currently expect non-GAAP net sales of approximately $2.18

billion to $2.23 billion, [and] pro forma adjusted EBITDA of approximately $620 million to $650 million . . . ."

66.    Similarly, when Cote was pressed by an analyst on the call whether there were any potential conflicts of interest between Resolute Holdings and GPGI's shareholders, Cote insisted: "I don't see a conflict.  So I mean the two are inextricable, so the success of RHL comes from the success of GPGI.  So I don't see a conflict, Tom.  I don't know."

67.    A few days later on March 16, 2026 at a JPMorgan Industrials Conference, defendant Cote highlighted the Husky Acquisition and recommended that investors buy GPGI stock:

> Here, we get to start with what we want.  ***So thinking back to the acquisition profile that we had at Honeywell, where we had the six criteria.  We always looked at great position, good industry, tech differentiation, organic and inorganic sales growth and margin expansion, we had that possibility here to start from scratch with the things that we wanted***.  And with the asset management company, we did get some multiple arbitrage out of the exact same earnings, but the foundation of all of it was GPGI as the currency and the vehicle.
>
> ***You saw us put that into motion with Husky***, and we were able to use our shares as a currency in addition to the cash that we generated as a way of acquiring Husky, which is going to turn out to be a very good business for us.  And we'll be able to do it with others.  So we're able to start with businesses we like.  We have this growth day mentality that we use.  It's the same thing that I did at Honeywell.
>
> We've got it at Vertiv.  We're doing it at CompoSecure and at Husky, the monthly growth day, where we take strategy and make it a daily activity.  So you start with businesses you like, put in leaders who truly are going to lead the businesses and establish the culture that you're looking for, put those growth days in place and GPGI is going to do very well.
>
> ***Now Resolute only does well if GPGI does well.  And I know there's always some questions about that one, but I'm not sure what I understand why there's a question.  So we feel pretty bullish about where this is going.  We're quite surprised by the reaction last week***.  I was talking with Kurt Martinson about it earlier.
>
> ***Shocked actually at the reaction last week when we posted our earnings, I thought it was going to go the other way around, which it will.  So I'd say now is a buying opportunity***.

68.    The statements referenced in ¶¶65-67 above were materially false and misleading when made because they failed to disclose the following adverse facts pertaining to the Company's business, operations, and financial condition, which were known to or recklessly disregarded by defendants:

(a)    that defendants had materially overstated the value of Husky;

(b)    that Husky was not on track to achieve the revenue and Adjusted EBITDA targets provided in the Proxy Statement and such targets lacked a reasonable basis in objective fact;

(c)    that a primary motivation of the Husky Acquisition was to generate millions of dollars in fees for Resolute Holdings and the Individual Defendants, rather than to create long-term value for CompoSecure shareholders; and

(d)    that, as a result of (a)-(c) above, defendants had materially misrepresented the business, prospects, and expected financial results of GPGI and Husky as a combined business.

69.    On April 22, 2026, a redacted verified derivative and class action complaint was filed in the Delaware Court of Chancery, which allegedly followed a Delaware General Corporation Law Section 220 books and records inspection demand.  The complaint challenged a series of transactions involving Resolute's acquisition and control of CompoSecure, the Spin-Off, the Management Agreement, the Husky Acquisition, and the Company's then-proposed reincorporation from Delaware to Nevada in an effort to avoid or minimize Company insiders' liability under Delaware law.  The complaint alleged that the defendants had engaged in "a multi-step scheme" to entrench their operational control of the Company while creating a structural conflict that would drain value from GPGI for the benefit of certain defendants.  The complaint asserted fiduciary duty claims derivatively on behalf of GPGI against David Cote, Thomas Knott,

John Cote, their investment vehicles, and current GPGI directors, and asserted direct class claims on behalf of GPGI public stockholders, with Resolute Holdings named as an aiding-and-abetting defendant.

70. On May 7, 2026, GPGI reported its 1Q26 financial results. Although the Company's CompoSecure segment reported favorable results, the results of GPGI's Husky segment were abysmal. Husky's Pro Forma Adjusted Net Sales were just $290.8 million, down 5.2% year-over-year, and its Pro Forma Adjusted EBITDA fell to $38 million, down a staggering *40.2%* year-over year.[13]

71. Additionally, GPGI cut 2026 guidance, with its Pro Forma Adjusted Net Sales lowered from an initial range of $2.183 billion to $2.228 billion to a range of $1.95 billion to $2.10 billion, and its Pro Forma Adjusted EBITDA lowered from an initial range of $620 million to $650 million to a range of $550 million to $610 million.

72. In a press release issued that day, defendants Cote and Knott acknowledged Husky's disappointing results but attempted to blame macroeconomic challenges, stating in relevant part as follows:

> Dave Cote, GPGI's Executive Chairman, noted: "The first quarter was highlighted by record sales at CompoSecure, reflecting the effectiveness of implementing the Resolute Operating System for both growth and profitability. At Husky, we unfortunately encountered *unanticipated market headwinds due to oil and resin price volatility and continued tariff uncertainty*. As a result, we are taking necessary cost actions while continuing to make strategic investments for future growth. We will navigate these *market headwinds*, implement ROS, and become a stronger business as we exit the year."
>
> Tom Knott, GPGI's Chief Investment Officer, added: "While the *abrupt macroeconomic headwinds* facing Husky overshadowed the record sales at

---

[13] Pro Forma measures reflect financial results as if the Husky Acquisition had occurred on January 1, 2025. Adjusted measures reflect financial results as if GPGI consolidated the results of GPGI Holdings, L.L.C., including its operating businesses CompoSecure and Husky, for the periods indicated.

CompoSecure, we remain focused on driving cultural change, ROS implementation, and continued seed planting to make 2026 a foundational year that sets us up to deliver best-in-class top line growth, margin expansion, and free cash flow generation."

73.    But on the accompanying earnings call that day, defendant Cote admitted to underlying demand problems, acknowledging that customers were not accepting orders on Husky's preferred timetable with no clear end to these challenges in sight, stating as follows:

Husky, unfortunately, has encountered unanticipated market headwinds because of oil market volatility and tariffs. ***This has caused customers to delay accepting orders that normally would have been expected to ship in the quarter, while also reducing new orders***.

   Well, you'll likely ask what changed. Since I spoke to you on our March 12 fourth quarter earnings call, we saw a significant and surprising increase in customers taking a wait-and-see approach in response to those changing macro conditions. At the time of the call, February year-to-date orders were up approximately 27% versus prior year, and the pipeline was up approximately 6% year-over-year.

   ***The amount of poke and ship required to make the quarter was not unusual given history, and in the subsequent two and a half weeks, several customers would not finalize their orders for shipment, we could not ship to a couple of countries, and customers delayed placing an official order. This trend continues today***.

   ***We can't predict when it will end***, so we have provided a wider revised guidance range. In anticipation of lower sales, we've taken various actions on expenses to mitigate some of the impact of those lower sales.

74.    Defendant Knott similarly admitted that customers had not timely accepted shipments, stating: "Orders fell 16% year over year to the end of March as resin prices spiked and ***customers delayed accepting shipments*** and placing orders."

75.    In response to the news, the price of GPGI common stock closed at $12.94 per share on May 7, 2026, down $4.52 per share (nearly 26%) on abnormally high volume.

76.    On May 14, 2026, a second redacted verified stockholder derivative and class action complaint was filed in the Delaware Court of Chancery. Like the first verified shareholder

- 31 -

complaint, the complaint allegedly followed a Section 220 books and records demand and asserted derivative and direct class claims on behalf of GPGI and its public stockholders against David Cote, Thomas Knott, John Cote, their Resolute-affiliated investment vehicles, current and former GPGI directors and officers, and Resolute Holdings.

77.     Husky's disappointing results so soon after the Acquisition corroborates allegations that defendants materially overstated the value of Husky in order to induce GPGI's shareholders to approve the Husky Acquisition.  Since the publication of the JR Report on February 26, 2026, GPGI's share price declined from a close of $23.12 per share to $12.94 per share on May 7, 2026, a decline of 44%.  As a result, GPGI's market capitalization has shrunk by billions, notwithstanding the fact that GPGI's CompoSecure segment has reported favorable results.  By contrast, defendants have profited from the Husky Acquisition, as total management fees paid by GPGI to Resolute Holdings pursuant to the Management Agreements totaled $12.9 million in the first quarter of 2026 alone – a three-fold increase from the $4 million management fee paid by GPGI in 4Q25 before the Husky Acquisition closed.

78.     As a result of these serial disclosures, and defendants' fraudulent scheme and course of business during the Class Period, plaintiff and other members of the Class have suffered damages under the federal securities laws.

### ADDITIONAL SCIENTER ALLEGATIONS

79.     As alleged herein, defendants acted with scienter in that defendants knew, or recklessly disregarded, that the public documents and statements they issued and disseminated to the investing public during the Class Period were materially false and misleading.  Defendants knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements and documents as primary violations of the federal securities laws.  Defendants, by virtue of their receipt of information reflecting the true facts regarding GPGI and its business, and

their control over and/or receipt and/or modification of GPGI's materially false and misleading statements, were active and culpable participants in the fraudulent scheme alleged herein.

80.    Defendants knew and recklessly disregarded the false and misleading nature of the information they caused to be disseminated to the investing public.   The fraudulent scheme described herein could not have been perpetuated during the Class Period without the knowledge and complicity of, or at least the reckless disregard by, personnel at the highest levels of GPGI, including the Individual Defendants.

81.    The Individual Defendants, because of their positions with GPGI and/or Resolute Holdings, controlled the contents of GPGI's public statements during the Class Period and were intimately involved in GPGI's business.  The Individual Defendants were each provided with or had access to the information alleged herein to be false and misleading prior to or shortly after its issuance and had the ability and opportunity to prevent its issuance or cause it to be corrected. Because of their positions and access to material, non-public information, the Individual Defendants knew or recklessly disregarded that the adverse facts specified herein had not been disclosed to and were being concealed from the public and that the positive representations that were being made were false and misleading.

82.    Moreover, defendants had access to data and facts, including from Company documents, which made them aware of and provided access to the true state of GPGI's business that was concealed from investors.  The Individual Defendants were intimately involved with the Husky Acquisition, recommending in the Proxy Statement that CompoSecure shareholders approve the share issuance necessary to consummate the transaction, and making highly positive statements about Husky in written and oral statements as detailed herein.  Defendants Cote and Knott, for instance, stated that Husky "checks every box of our investment criteria" and

emphasized their longstanding familiarity and admiration for Husky. For example, Cote stated: "This is a business Tom and I have long admired, and it hits all the key criteria we look for in every investment – it holds a great position in a good industry, significant technology differentiation, organic and inorganic growth possibilities, and margin expansion potential."

83. In addition, Cote, Knott, and Resolute Holdings were highly motivated to hide the true value of Husky and the true state of its business in order to secure shareholder approval of the Husky Acquisition and generate millions of dollars' worth of additional management fees for themselves. According to the Proxy Statement, CompoSecure and Husky were collectively projected to earn $634 million in Adjusted EBITDA in 2026 alone, roughly 10% of which (approximately $63 million) would ultimately be paid in management fees to Resolute Holdings. Even though Husky's Adjusted EBITDA was artificially inflated in the Proxy Statement as detailed herein, defendants stood to earn tens of millions of dollars in additional management fees as a result of the Husky Acquisition.

84. The departure of multiple high-level officers from GPGI further bolsters an already compelling inference of scienter. First, GPGI's long-standing CFO Tim Fitzsimmons left in the latter half of 2025. Then, on January 21, 2026, GPGI announced that defendant Wilk was unexpectedly stepping down as CEO after ten years of service. The following month, GPGI announced that Husky's CEO, Bradley Selleck, as well as Husky's CFO, John Linker, were both leaving "for personal reasons" in April and March 2026, respectively. When the Husky Acquisition was first announced, however, the press release stated that Husky would "be run as a standalone business alongside CompoSecure and [would] *continue to operate under its current management team*." Four unexpected high-level officer departures around the time of the closing of the Husky Acquisition further corroborates defendants' scienter.

**LOSS CAUSATION**

85.     During the Class Period, as detailed herein, defendants made false and misleading statements and engaged in a scheme to deceive the market and a course of conduct that artificially inflated the prices of GPGI Class A common stock and operated as a fraud or deceit on purchasers of GPGI Class A common stock during the Class Period by misrepresenting Husky's business and prospects and the value of the Husky Acquisition.  Later, and as detailed herein, when defendants' prior misrepresentations and fraudulent conduct became apparent to the market, the price of GPGI Class A common stock fell precipitously, as the prior artificial inflation came out of the price over time.  As a result of their purchases of GPGI Class A common stock during the Class Period, plaintiff and other members of the Class suffered economic loss, *i.e.*, damages, under the federal securities laws.

**NO SAFE HARBOR**

86.     The Private Securities Litigation Reform Act of 1995's statutory safe harbor and/or the bespeaks caution doctrine applicable to forward-looking statements under certain circumstances do not apply to any of the materially false or misleading statements alleged herein.

87.     None of the statements complained of herein was a forward-looking statement, nor were they identified as "forward-looking statements" when made.  Rather, each was a historical statement or a statement of purportedly current facts and conditions at the time each statement was made.  Moreover, the statutory safe harbor does not apply to statements included in financial statements that purport to have been prepared in accordance with GAAP.

88.     To the extent that any of the materially false and/or misleading statements alleged herein, or any portion thereof, can be construed as forward-looking, any such statement was not accompanied by meaningful cautionary language identifying important facts that could cause actual results to differ materially from those in the statement.

- 35 -

89.     To the extent that the statutory safe harbor does apply to any forward-looking statement alleged herein, defendants are liable for any such statement because at the time such statement was made, the particular speaker actually knew that the statement was false or misleading, and/or the statement was authorized and/or approved by an executive officer of GPGI who actually knew that such statement was false when made.

## APPLICABILITY OF PRESUMPTION OF RELIANCE

90.     At all relevant times, the market for GPGI Class A common stock was an efficient market for the following reasons, among others:

(a)     GPGI Class A common stock met the requirements for listing and was listed and actively traded on the NYSE, a highly efficient, national stock market;

(b)     as a regulated issuer, GPGI filed periodic public reports with the SEC;

(c)     according to the Company's Form 10-Q for the quarter ended March 31, 2026 filed with the SEC on May 7, 2026, GPGI had approximately 290 million shares of Class A common stock outstanding as of that date;

(d)     GPGI regularly communicated with public investors via established market communication mechanisms, including the regular dissemination of press releases on national circuits of major newswire services, the Internet, and other wide-ranging public disclosures; and

(e)     unexpected material news about GPGI was rapidly reflected in and incorporated into prices for shares of GPGI Class A common stock during the Class Period.

91.     As a result of the foregoing, the market for GPGI Class A common stock promptly digested current information regarding GPGI from all publicly available sources and reflected such information in the price of the stock.  Under these circumstances, all purchasers of GPGI Class A common stock during the Class Period suffered similar injury through their purchases of GPGI

- 36 -

Class A common stock at artificially inflated prices and a presumption of reliance applies under the Supreme Court's holding in *Basic Inc. v. Levinson*, 485 U.S. 224 (1988).

92.     A Class-wide presumption of reliance is also appropriate in this action under the Supreme Court's holding in *Affiliated Ute Citizens v. United States*, 406 U.S. 128 (1972), because the Class's claims are, in large part, grounded on defendants' material misstatements and/or omissions.   Because this action involves defendants' failure to disclose material adverse information regarding the Company's business operations and financial prospects – information that defendants were obligated to disclose – positive proof of reliance is not a prerequisite to recovery.  All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered them important in making investment decisions.   Given the importance of the Class Period material misstatements and omissions set forth above, that requirement is satisfied here.

## CLASS ACTION ALLEGATIONS

93.     Plaintiff brings this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of all persons who purchased GPGI Class A common stock during the Class Period (the "Class").  Excluded from the Class are defendants and their families, the officers and directors of GPGI, Husky, and Resolute Holdings, at all relevant times, members of their immediate families and their legal representatives, heirs, successors, or assigns, and any entity in which defendants have or had a controlling interest.

94.     The members of the Class are so numerous that joinder of all members is impracticable.  Throughout the Class Period, shares of GPGI Class A common stock were actively traded on the NYSE.  While the exact number of Class members is unknown to plaintiff at this time and can only be ascertained through appropriate discovery, plaintiff believes that there are thousands of members in the proposed Class.  Record owners and other members of the Class may

be identified from records maintained by GPGI or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions, including being given an opportunity to exclude themselves from the Class.

95.    Plaintiff's claims are typical of the claims of the members of the Class, as all members of the Class are similarly affected by defendants' wrongful conduct in violation of federal law that is complained of herein.

96.    Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.

97.    Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

(a)    whether defendants' statements during the Class Period were materially false and misleading;

(b)    whether defendants acted with scienter in issuing materially false and misleading statements during the Class Period; and

(c)    the extent of injuries sustained by the members of the Class and the appropriate measure of damages.

98.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

## COUNT I

### For Violation of §10(b) of the 1934 Act and Rule 10b-5
### Against GPGI and the Individual Defendants

99.    Plaintiff incorporates ¶¶1-98 by reference.

100.    During the Class Period, defendants disseminated or approved the false statements specified above, which they knew or deliberately disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

101.    The defendants named herein violated §10(b) of the 1934 Act and Rule 10b-5 in that they:

(a)    employed devices, schemes, and artifices to defraud;

(b)    made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or

(c)    engaged in acts, practices, and a course of business that operated as a fraud or deceit upon plaintiff and others similarly situated in connection with their purchases of GPGI Class A common stock during the Class Period.

102.    Plaintiff and the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for GPGI Class A common stock.  Plaintiff and the Class would not have purchased GPGI Class A common stock at the prices they paid, or at all, if they had been aware that the market prices had been artificially and falsely inflated by defendants' misleading statements.

103.    As a direct and proximate result of defendants' wrongful conduct, plaintiff and other members of the Class suffered damages in connection with their purchases of GPGI Class A common stock during the Class Period.

## COUNT II

### For Violation of §20(a) of the 1934 Act
### Against the Individual Defendants and Resolute Holdings

104.    Plaintiff incorporates ¶¶1-103 by reference.

105.    The Individual Defendants were and acted as controlling persons of GPGI within the meaning of §20(a) of the 1934 Act.  By reason of their positions at the Company and/or Resolute Holdings, the Individual Defendants had the power and ability to control, and actually did control, directly or indirectly, the day-to-day actions of GPGI, including the content and dissemination of the various statements that plaintiff contends are materially false and misleading and the wrongful conduct complained of herein.

106.    Resolute Holdings was and acted as a controlling person of GPGI within the meaning of §20(a) the 1934 Act.  Resolute Holdings controlled GPGI's day-to-day operations and corporate strategy pursuant to the powers afforded to Resolute Holdings under the Management Agreements.  Resolute Holdings' control over GPGI is further demonstrated by the fact that it was required to account for CompoSecure Holdings and Husky as consolidated variable interest entities because the terms of the management agreements made Resolute Holdings the primary beneficiary of CompoSecure Holdings and Husky.

107.    By reason of such conduct, defendants are liable pursuant to §20(a) of the 1934 Act.

## PRAYER FOR RELIEF

WHEREFORE, plaintiff prays for relief and judgment as follows:

A.      Determining that this action is a proper class action, designating plaintiff as a Lead Plaintiff, and certifying plaintiff as a Class representative under Rule 23 of the Federal Rules of Civil Procedure and appointing plaintiff's counsel as Lead Counsel;

B.      Awarding compensatory damages in favor of plaintiff and the other Class members against all defendants, jointly and severally, for all damages sustained as a result of defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

C.      Awarding plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

D.      Awarding such equitable, injunctive, or other relief as the Court may deem just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury.

DATED: July 14, 2026                    ROBBINS GELLER RUDMAN
                                          & DOWD LLP
                                        SAMUEL H. RUDMAN


                                           s/ Samuel H. Rudman
                                        SAMUEL H. RUDMAN

                                        58 South Service Road, Suite 200
                                        Melville, NY  11747
                                        Telephone:  631/367-7100
                                        srudman@rgrdlaw.com

                                        ROBBINS GELLER RUDMAN
                                          & DOWD LLP
                                        BRIAN E. COCHRAN
                                        655 West Broadway, Suite 1900
                                        San Diego, CA  92101
                                        Telephone:  619/231-1058
                                        bcochran@rgrdlaw.com

ROBBINS GELLER RUDMAN
  & DOWD LLP
RICHARD GONNELLO
420 Lexington Avenue, Suite 1832
New York, NY  10170
Telephone:  212/432-5100
rgonnello@rgrdlaw.com

Attorneys for Plaintiff

VMT LAW, P.C.
THOMAS C. MICHAUD
79 Alfred Street
Detroit, MI  48201
Telephone:  313/578-1200
tmichaud@vmtlaw.com

Additional Counsel

## CERTIFICATION OF NAMED PLAINTIFF
## PURSUANT TO FEDERAL SECURITIES LAWS

City of Warren Police and Fire Retirement System ("Plaintiff") declares:

1.      Plaintiff has reviewed a complaint and authorized its filing.

2.      Plaintiff did not acquire the security that is the subject of this action at the direction of plaintiff's counsel or in order to participate in this private action or any other litigation under the federal securities laws.

3.      Plaintiff is willing to serve as a representative party on behalf of the class, including providing testimony at deposition and trial, if necessary.

4.      Plaintiff has made the following transaction(s) during the Class Period in the securities that are the subject of this action:  *See* attached Schedule A.

5.      Plaintiff has not sought to serve or served as a representative party in a class action that was filed under the federal securities laws within the three-year period prior to the date of this Certification except as detailed below:

> *Zornberg v. NAPCO Security Technologies, Inc.,* No. 1:23-cv-06465 (E.D.N.Y.)
> *Munch v. Sprout Social, Inc.,* No. 1:24-cv-03867 (N.D. Ill.)
> *McCarty v. Alight, Inc.,* No. 1:26-cv-02924 (N.D. Ill.)

6.      Plaintiff will not accept any payment for serving as a representative party on behalf of the class beyond the Plaintiff's pro rata share of any recovery, except such reasonable costs and expenses (including lost wages) directly relating to the representation of the class as ordered or approved by the court.

I declare under penalty of perjury that the foregoing is true and correct.  Executed this ⁹ᵗʰ day of July, 2026.

City of Warren Police and Fire Retirement System

By: _Scott J. Sube_____

Its: _Chairman_____

## SCHEDULE A

## SECURITIES TRANSACTIONS

**Common Stock**

| Date Acquired | Amount of Shares Acquired | Price |
|---|---|---|
| 11/18/2025 | 1,660 | $19.27 |
| 01/02/2026 | 2,130 | $18.80 |
| 03/03/2026 | 280 | $22.16 |
| 03/03/2026 | 860 | $21.71 |
| 04/07/2026 | 2,060 | $15.95 |
| 04/14/2026 | 4,690 | $16.95 |

| Date Disposed | Amount of Shares Disposed | Price |
|---|---|---|
| 04/29/2026 | 1,750 | $14.37 |

Prices listed are rounded up to two decimal places.

*Opening position of 9,817 shares.